# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| JOY HARVICK, individually and on behalf of all others similarly situated, | § § § | |
| *Plaintiff,* | § § | Case No. 1:24-cv-1373-RP |
| vs. | § § § | |
| ELON MUSK & AMERICA PAC, | § § § | |
| *Defendants.* | § § | |

### Defendants' Motion to Dismiss

Defendants Elon Musk and America PAC move to dismiss Plaintiff's Original Class Action Complaint (ECF No. 1) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### Introduction

Last year, America PAC, a political committee, encouraged registered voters in seven states ("Eligible Voters") to sign a citizen petition supporting the Constitution's First and Second Amendments. America PAC offered to pay $47 to each Eligible Voter who referred (the "Referrer") another Eligible Voter (the "Referee") to sign the petition. Once verified as an eligible Referrer of an eligible Referee, America PAC paid the Referrer $47 per eligible referral. Each verified Eligible Voter who signed the petition also qualified to be considered and potentially selected for the opportunity to earn $1 million in return for serving as a paid spokesperson for America PAC and the citizen petition.

When a verified Eligible Voter learned that they were selected as a spokesperson—and, in doing so, would earn $1 million—their natural reaction was euphoric. Selected earners experienced intense excitement and happiness, much like the reaction that someone would experience upon learning that they have won a lottery. But make no mistake: **an Eligible Voter's <u>opportunity to earn</u> is not the same thing as a <u>chance to win</u>**. Unlike a lottery, which requires, *inter alia*, winners determined by

1

chance, America PAC vetted and selected its spokespersons. Like a job application, verified Eligible Voters who signed the petition were evaluated and considered for a potential opportunity to become a paid spokesperson. All participants in the petition program had to *do something* to earn money. For a $47 referral fee, an Eligible Voter had to make a valid referral. For a $1 million spokesperson payment, an Eligible Voter had to sign and perform a spokesperson contract.

Plaintiff says that she viewed this petition program as a "lottery." This legally conclusory assertion is contradicted by the facts alleged in the Complaint. A lottery requires three elements: (1) prize; (2) chance; and, (3) consideration. Tex. Penal Code § 47.01(7). Plaintiff concedes that "chance" was not involved here, as individuals earned money by referring verified Eligible Voters to sign the petition (or, if selected, by fulfilling a spokesperson contract). Thus, as a matter of fact and of law, no "lottery" exists. Yet Plaintiff inserts this erroneous "lottery" premise throughout her Complaint in an attempt to support four substantive claims: fraud, breach of contract, an alleged Texas Deceptive Trade Practices Act ("DTPA") violation, and unjust enrichment.

This case should be dismissed for three primary reasons, each of which is independently sufficient to dispose of the entire matter. <u>First</u>, Plaintiff lacks standing because she fails to allege any concrete harm she has suffered through the petition program. <u>Second</u>, Plaintiff's claims sound in fraud and fail because she did not plead fraud with particularity as Federal Rule of Civil Procedure 9(b) requires. <u>Third</u>, Plaintiff does not state a plausible claim under any of her legal theories. The fraud claim fails because she identifies no false representation by Defendants. The breach of contract claim fails because she does not allege the existence of a valid or enforceable contract. The DTPA claim fails because she is not a "consumer" under the DTPA. And the unjust enrichment claim fails because the basic contact information Plaintiff input on the petition is not a "benefit" she conferred upon Defendants. Without standing or a plausible legal claim, the request for injunctive relief also fails.

Plaintiff's allegations are not the first pertaining to these issues to have been considered in court. In October 2024, the Philadelphia District Attorney filed a civil suit alleging that America PAC's citizen petition program was an illegal lottery and a violation of the Pennsylvania Consumer Protection Act.[1] After extensive briefing and an evidentiary trial, those claims were rejected[2] and the Philadelphia DA dropped his case.[3] Plaintiff's attempt to recast this "lottery" theory under Texas law similarly fails.[4]

**FACTUAL BACKGROUND**

## I.    The Parties

Elon Musk founded America PAC, an independent expenditure only political committee registered with the Federal Election Commission. *See* Compl. ¶¶ 6–7. America PAC's mission is to "support 'Secure Borders, Safe Cities, Free Speech, Sensible Spending, Fair Justice System and Self-Protection.'" *Id.* ¶ 6 (quoting https://theamericapac.org/).

Plaintiff Joy Harvick states that she is "a citizen and resident of Maricopa County, Arizona." *Id.* ¶ 4. She does not state that she is a registered voter. *See* Compl.

## II.    America PAC's Citizen Petition Program and $1 Million Spokesperson Opportunities

Beginning in October 2024, visitors to America PAC's website could sign a "Petition in Favor of Free Speech and the Right to Bear Arms." *Id.* ¶ 10.[5] To sign the petition, a person typed their first and last name, email, mailing address, and phone number and clicked "Sign Petition." *Id.* ¶¶ 21–22. Under cell phone number, the petition says "Will only be used to confirm you are the legitimate petition signer. No other purpose." *Id.* ¶ 22. The website's Privacy Policy further states,

---

[1] *Krasner v. America PAC*, No. 3509 (Pa. Phila. Cty. C.P., Oct. Term 2024), https://www.pacourts.us/Storage/media/pdfs/20241028/193831-oct.28,2024-krasnervsmusk.pdf.
[2] Findings of Fact & Conclusions of Law, *Krasner v. Musk*, No. 241003509 (Pa. Phila. Cty. C.P. Nov. 12, 2024),  https://www.pacourts.us/Storage/media/pdfs/20241113/183454-krasnervmusketalfindingsoffactandconclusionsoflaw.pdf, APPX.001–.037.
[3] Praecipe, *Krasner v. Musk*, No. 241003509 (Pa. Phila. Cty. C.P. Nov. 21, 2024), APPX.038-.040.
[4] The related case of *McAferty v. Musk*, No. 1-24-cv-1346-RP (W.D. Tex.—Austin Div.), makes substantively identical factual allegations and should be dismissed for the same reasons stated here.
[5] *See also* America PAC Petition, APPX.041–.043.

"Personal Identifying Information collected via the www.theamericapac.org will only be used to support America PAC's activities, and it will not be shared with any advertisers, political organizations, or third parties not directly affiliated with America PAC."[6]

America PAC encouraged those who signed the petition to refer others, "with an offer to pay individuals $47 for each registered voter referred who signed the petition." *Id.* ¶ 10. The opportunity "was 'exclusively open to'" Eligible Voters, *i.e.*, "registered voters in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina' and 'expire[d] November 5.'" *Id.*

At an October 19, 2024 town hall, Musk announced an effort to promote the petition: "I have a surprise for you. Which is that we're going to be awarding $1 million dollars to, randomly, to people who have signed the petition, every day from now until the election." *Id.* ¶ 12 (citing @America, X (Oct. 19, 2024, 11:06 PM)).[7] Musk then called an audience member, John Dreher, to the stage as the first $1 million recipient, and told Dreher, **"<u>The only thing we ask for the million dollars is that you be a spokesperson for the petition.</u>"** *Id.* (emphasis added); Compl. ¶ 15. America PAC posted a video of the announcement on X, *id.* ¶ 12, and later posted, "Every day from now until Election Day, one registered swing state voter who signs the petition will be **selected to earn** $1 MILLION," with a link to the petition. *Id.* ¶ 16 (citing @America, X (Oct. 19, 2024, 11:58 PM))[8] (emphasis added).

The next day, at another America PAC town hall, Musk announced audience member Kristine Fiskell as a $1 million spokesperson. *Id.* ¶ 18. Plaintiff notes that each spokesperson "is featured on America PAC's website and X handle." *Id.* ¶ 25. She also concedes that those selected for a $1 million spokesperson opportunity were "chosen based on their personal stories," and had to sign and perform "a contract with America PAC." *Id.* ¶ 29.

---

[6] https://theamericapac.org/privacy-policy, APPX.044–046.
[7] https://x.com/america/status/1847851986495881434 (video embedded in URL).
[8] https://x.com/america/status/1847864967816511758.

**III. After not being selected to earn $1 million as a spokesperson, Plaintiff now claims that the PAC's citizen petition program was illegal.**

Plaintiff signed the petition on October 23, 2024, providing her "name, email address, mailing address, and cell phone number." *Id.* ¶¶ 32–33. She does not claim that she is an Eligible Voter (*i.e.*, a registered voter in one of the seven states who would have been eligible to receive a payment through the petition program—whether $47 for a referral or $1 million for a spokesperson contract). Nor does she allege that she referred any verified Referee to sign the petition in exchange for any $47 payment. Plaintiff was not selected to earn $1 million as a spokesperson and sues.

Plaintiff's theory of liability is that "the lottery was not random" because "her selection [to receive $1 million as a spokesperson] hinged on her perceived favorability to Defendants as a marketing prop." *Id.* ¶ 36. By noting how recipients were selected, Plaintiff concedes that—as a legal matter—there was no "lottery" at all. *See* Tex. Penal Code § 47.01(7). Despite this concession, Plaintiff alleges that she *believed* that Defendants were operating a lottery where $1 million recipients would be chosen via "random drawing." Compl. ¶¶ 21, 35, 36, 54, 59, 65, 67, 71, 72, 75, 85, 88 (alleging a "lottery"); 67 (alleging that "Defendant" "agreed to" select $1 million recipients by "drawing randomly"). Plaintiff claims that her expectation that the PAC would select spokespersons through "random drawings" gives rise to four substantive legal claims and a right to an injunction, and purports to sue on behalf of "all citizens of the United States who signed the America PAC Petition." *Id.* at 9.

ARGUMENT & AUTHORITY

**I. This case should be dismissed under Rule 12(b)(1) for lack of jurisdiction.**

**a.    Standard for Dismissal Under Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. "Federal courts do not possess a roving commission to publicly opine on every legal question," nor do they "exercise general legal oversight…of private entities." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Rather, Article III of the Constitution limits federal court

jurisdiction to actual "cases" and "controversies." U.S. Const. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). Accordingly, when a court lacks statutory or constitutional power to adjudicate a case, that case must be dismissed for lack of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Jurisdiction is a threshold issue that must be resolved before reaching the merits. *Id.* at 94–95.

The "irreducible constitutional minimum" of standing requires three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must have: (1) suffered an injury in fact; (2) that is traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable decision. *Id.* at 560–61. As the party invoking the court's jurisdiction, a plaintiff must show all three elements. *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element" of standing. *Spokeo*, 578 U.S. at 338 (citation omitted) (cleaned up). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion*, 594 U.S. at 423 (citation omitted).[9]

### b. Plaintiff has no case or controversy with Defendants because she has not pled eligibility to participate in the citizen petition program.

As a threshold matter, Plaintiff has not carried her burden to allege standing because she does not plead that she was an Eligible Voter in the first place. Plaintiff admits that the petition program "was *exclusively open to registered voters* in [states including] Arizona." Compl. ¶ 10 (emphasis added). But—while she claims to reside in Arizona—Plaintiff does not allege that she is a *registered voter* in

---

[9] That Plaintiff brings a putative class action does not impact the threshold showing required to withstand a 12(b)(1) motion. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("'That a suit may be a class action…adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured.'") (citation omitted).

Arizona. Without affirmatively alleging that she was eligible to participate in the petition program, Plaintiff lacks standing to challenge it. *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

### c.    Plaintiff lacks Article III standing because she has not pled injury in fact.

Even if Plaintiff had pled eligibility to participate in the petition program, she would still lack standing because she has not alleged injury in fact. "To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing." *TransUnion*, 594 U.S. at 417. To show concrete harm, a plaintiff must have suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation omitted). To be concrete, an injury must "actually exist," though it may be "tangible" or "intangible." *Id.* The most obvious injuries are "traditional tangible harms, such as physical harms and monetary harms," but "[v]arious intangible harms can also be concrete," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425 (citations omitted). "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (citation omitted).

Merely invoking a statutory cause of action does not satisfy Article III. That is because "[i]njury in fact is a constitutional requirement, and it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 578 U.S. at 339 (citations omitted) (cleaned up). To be sure, "[i]n determining whether a harm is sufficiently concrete to qualify as an injury in fact," courts "afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or

obligation." *TransUnion*, 594 U.S. at 425. But the Supreme "Court has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 426 (quoting *Spokeo*, 578 U.S. at 341). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* For example, the Supreme Court has explained that—although the Fair Credit Reporting Act (FCRA) prohibits distributing false consumer information—"not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm" for Article III standing purposes. *Spokeo*, 578 U.S. at 342.

Remarkably, the whole of Plaintiff's asserted injury is that she and the proposed class "suffered damages by giving their valuable personal information to Defendants." Compl. ¶¶ 60, 68, 77; *see also id.* ¶ 82–83 (alleging that "Plaintiff was induced to provide" her information."). This does not state injury in fact, because Plaintiff's provision of her name and contact information to Defendants is not a "concrete harm" under Article III.

The Supreme Court recently addressed concreteness in *TransUnion*, which involved a practice of flagging consumer credit files with an alert based on loose matches with the Treasury Department's Office of Foreign Assets Control ("OFAC") list. 594 U.S. at 443. This "generated many false positives." *Id.* at 419–20. A class of consumers whose credit reports were wrongly flagged sued, alleging that TransUnion "failed to comply with statutory obligations [under the FCRA] to follow reasonable procedures to ensure the accuracy of credit files so that the files would not include OFAC alerts labeling the plaintiffs as potential terrorists." *Id.* at 430.

In assessing concreteness, the Court "distinguishe[d] between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies disseminate to third-party creditors." *Id.* at 434. This matters because "[t]he mere presence

of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* On the other hand, when "TransUnion provided third parties with credit reports containing OFAC alerts that labeled [] class members as potential terrorists, drug traffickers, or serious criminals" those plaintiffs "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation," which is "a concrete harm that qualifies as an injury in fact." *Id.* at 442. Thus, the Court held that only those "class members whose credit reports were provided to third-party businesses suffered a concrete harm and thus have standing." *Id.* Those "whose credit reports were not provided to third-party businesses did not suffer a concrete harm and thus do not." *Id.*

Diligent research revealed *no case* where an allegation that a plaintiff's name, mailing address, email, and phone number were wrongly obtained was enough to state concrete harm under Article III. Rather, "concrete harm" related to such allegations has been found where a plaintiff suffered a concrete consequence because their information was *misused* in a manner that caused Plaintiff *actual injury* (for example, in certain data breach cases). No such concrete consequence is alleged here.

The most analogous case found, *Hancock v. Urban Outfitters*, involved a store's practice of requesting customer zip codes during credit card transactions. 830 F.3d 511, 512 (D.C. Cir. 2016). The plaintiffs claimed that this practice violated District of Columbia consumer protection laws by (i) falsely implying that a zip code is required for a credit card transaction; (ii) omitting the material fact that providing a zip code is optional; (iii) deceptively representing that requesting zip codes is legal and necessary for a credit card purchase; and (iv) violating a prohibition on obtaining addresses as a condition of a credit card transaction. *Id.* at 512–13.

*Hancock* held that the plaintiffs had not alleged concrete harm, reasoning, "If, as the Supreme Court advised [in *Spokeo*,] disclosure of an incorrect zip code is not a concrete Article III injury, then even less so is [a] naked assertion that a zip code was requested and recorded without any concrete consequence." *Id.* at 514. The court noted that the plaintiffs "do not allege, for example, any invasion

of privacy, increased risk of fraud or identity theft, or pecuniary or emotional injury," and concluded that "without any plausible allegation of Article III injury, the complaint fails to state a basis for federal court jurisdiction." *Id.*

So too here. Plaintiff alleges that her name, mailing address, email, and phone number were "requested and recorded without any concrete consequence." *Id.* Accordingly, like the plaintiffs in *Hancock*, Ms. Harvick has not alleged concrete harm, and she lacks standing. *See also, e.g.*, *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016) (plaintiff lacked standing to sue cable company for retaining personal information longer than federal law allowed because plaintiff "identifies no material risk of harm from the retention[,] [and] a speculative or hypothetical risk is insufficient.").

Similar results are obtained in data breach cases. These cases are not directly on point because they typically involve enough information to subject someone to identity theft, whereas the phone number, mailing address, and email Plaintiff provided pose no such risk.[10] But even in cases involving (1) information far more sensitive than what is at issue here; and (2) an undisputed "breach" of a database that a defendant had a duty to secure, courts do not recognize simple disclosure of or access to a plaintiff's information as a concrete harm for Article III purposes.

For example, the plaintiffs in *Eubanks v. Nelson* alleged disclosure of their information via electronic voting systems, and "believed that the release of their private and personal combination of information made them easy to identify and thus susceptible to harassment." No. 23-10936, 2024 WL

---

[10] *Compare, e.g.*, *In re SuperValu, Inc.*, 870 F.3d 763, 770 (8th Cir. 2017) (finding that concrete harm was not plausibly pled where hackers accessed credit card information, which "generally cannot be used alone to open unauthorized new accounts" and "does not include any personally identifying information, such as social security numbers, birth dates, or driver's license numbers"); *with Clemens v. ExecuPharm., Inc.*, 48 F.4th 146, 150 (3rd Cir. 2022) (finding that concrete harm was plausibly pled where (1) hackers stole "social security numbers, dates of birth, full names, home addresses, taxpayer identification numbers, banking information, credit card numbers, driver's license numbers, sensitive tax forms, and passport numbers;" (2) that information was for sale on the dark web; and, (3) plaintiff spent time and money on identity theft mitigation and therapy).

1434449, at *2 (5th Cir. Apr. 3, 2024), *cert. denied sub nom.*, *Gremont v. Nelson*, No. 24-258, 2024 WL 4654988 (U.S. Nov. 4, 2024) (citations omitted) (cleaned up). The Fifth Circuit held that "this alleged injury constitutes an undifferentiated, generalized grievance that is not particular to [the plaintiffs]. It is also too speculative to provide a basis for standing." *Id.* Similarly, *Logan v. Marker Grp,, Inc.* found that "conclusory statements alleging actual incidents of identity theft are insufficient to establish an injury in fact because such injuries require a showing that 'the information accessed *was actually misused* or that there has even been an attempt to use it.'" No. 4:22-CV-00174, 2024 WL 3489208, at *5 (S.D. Tex. July 18, 2024) (quoting *Green v. eBay Inc.*, No. CIV.A.14-1688, 2015 WL 2066531, at *4 (E.D. La. May 4, 2015)). *See also, e.g., Bednyak v. Fin. Risk Mitig., Inc.*, No. CV 24-25, 2024 WL 4869157, at *9 (E.D. La. May 31, 2024) ("Implicitly, Bednyak's position is that a data breach *ipso facto* establishes concrete injury due to diminished value of PII but this is not the law.").[11]

Plaintiff (at most) makes a vague, speculative, and conclusory allegation that "Defendants *could* benefit from [the] political and commercial use" of her information. Compl. ¶ 81 (emphasis added); *see also id.* ¶ 35 (alleging that "Defendants can profit or benefit from the use/sale of Plaintiff's PII."). But she does not allege that Defendants *actually used* her information in these ways, *or for anything at all*. She certainly does not allege any *misuse* of her information. *Cf., e.g., Logan*, 2024 WL 3489208, at *5. There is simply no Article III harm alleged here.[12]

---

[11] *See also, e.g., Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011) ("In data breach cases where no misuse is alleged…there has been no injury"); *Tsao v. Captiva MVP Rest. Partners*, 986 F.3d 1332, 1344 (11th Cir. 2021) ("vague, conclusory allegations that members of the class have suffered any actual misuse of their personal data…are not enough to confer standing."); *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 303–04 (2d Cir. 2021) ("Because McMorris did not allege that her PII was subject to a targeted data breach or allege any facts suggesting that her PII…was misused, the district court correctly dismissed her complaint for failure to establish an Article III injury in fact.").

[12] Allegations of "future" injury can support standing, but only if the injury is "imminent," meaning "there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "[A]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiff does not allege future injury; she does not allege any future activity whatsoever.

## II.    This case should be dismissed under Rule 12(b)(6) for failure to plead a plausible claim.

### a.    Standard for Dismissal under Rule 12(b)(6)

Dismissal is proper under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted) (cleaned up).

Though a court deciding a motion to dismiss accepts well-pleaded facts as true and construes them in favor of the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Rather, the factual allegations must be enough to "raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. To meet this standard, a complaint must plead facts sufficient "to raise a right to relief above the speculative level." *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007).

### b.    This case should be dismissed for failure to plead fraud with particularity.

Under Federal Rule of Civil Procedure 9(b), a party "alleging fraud...must state with particularity the circumstances constituting fraud," except that "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Allegations of fraud must [] meet a higher, or more strict, standard than the basic notice pleading required by Rule 8" because, among other things, "unsubstantiated charges of fraud can irreparably damage a defendant's reputation." *Norman v. Apache Corp.*, 19 F.3d 1017, 1022 (5th Cir. 1994) (citations omitted). Thus, "dismissal for failure to plead fraud with

particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." *Southland Securities Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004). Importantly, "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not." *Lone Star Ladies Inv. Club v. Schlotzky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001).[13]

All of Plaintiff's claims are subject to Rule 9(b), since they all arise from the same allegedly fraudulent conduct by Defendants. *E.g.*, *Dommert v. Raymond James Fin. Servs.*, Civ. No. A-1:06-CV-102, 2007 WL 1018234, at *12 (E.D. Tex. Mar. 29, 2007) ("When a claim for [] breach of contract is essentially a claim sounding in fraud, the particularity requirements of Rule 9(b) apply."); *Berry v. Indianapolis Life Ins. Co.*, 608 F.Supp.2d 785, 800 (N.D. Tex. 2009) ("It is well-established that claims alleging violations of the DTPA are subject to the requirements of Rule 9(b)," particularly when a "DTPA claim is predicated on the same misrepresentations and omissions as the fraud claim.") (citations omitted) (cleaned up); *Rangel v. Adtalem Golbal Educ., Inc.*, No. 5:18-CV-00082-DAE, 2019 WL 13150012, at *5 (W.D. Tex. Apr. 23, 2019) (where the "requirements of Rule 9(b) have not been satisfied, and…Plaintiffs' unjust enrichment claims are predicated on their DTPA claims, the unjust enrichment claims…cannot be ruled upon.").

Indeed, Plaintiffs' entire case is "predicated on the same" alleged "false representations" by Defendants about the petition program. *Berry v. Indianapolis Life Ins. Co.*, 608 F.Supp.2d at 800; Compl. ¶¶ 55, 64, 74 ("Defendants' representations were false because they have since admitted that the

---

[13] "Rule 9(b) appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud…This is true even in cases where fraud is not a necessary element of a claim. Even in such cases, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct, or allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim, in which event the claim is said to be grounded in fraud or to sound in fraud, and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Clouse v. Success Sys., LLC*, No. SA-23-CV-1380-OLG (HJB), 2024 WL 4002774, at *3 (W.D. Tex. Aug. 6, 2024), *report & recommendation adopted*, 2024 WL 3998289 (W.D. Tex. Aug. 27, 2024) (citations omitted) (cleaned up).

winners were pre-determined."), 82–83 ("Plaintiff was induced to provide" her information in return for "a daily random chance at a $1 million prize."). Thus, each claim is subject to Rule 9(b).

The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted). "[G]eneral allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)." *In re Urcaro Sec. Lit.*, 148 F.R.D. 561, 569 (N.D. Tex. 1993), *aff'd*, *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *see also Patel v. Holiday Hospitality Franchising, Inc.*, 172 F.Supp.2d 821, 825 (N.D. Tex. 2001) (DTPA claim based on fraudulent misrepresentations was subject to and failed Rule 9(b) where "plaintiffs lumped both defendants together and failed to sort out the wrongdoing of each defendant.").

The Complaint fails this standard. It references several X posts (by Musk and the PAC) and two town hall statements (by Musk), but does not specify *which of these statements* was allegedly fraudulent. Instead, it obliquely alleges that "Defendants made material representations, *i.e.* that by signing the petition, Plaintiff and members of the proposed Class were eligible to win $1,000,000 through random selection." Compl. ¶¶ 54, 63, 73. It also alleges that "Plaintiff was induced to provide" her information, but does not specify what act by Defendants purportedly "induced" her to do this. *Id.* ¶¶ 82–83.

These allegations fail to "identify the speaker, state when and where the statements were made, and explain why the" purportedly actionable "statements were fraudulent." *Flaherty*, 565 F.3d at 207. Plaintiff also "lump[s] all defendants together failing to segregate the alleged wrongdoing of one from [] another." *In re Urcaro*, 148 F.R.D. at 569. Further muddying the waters, Plaintiff claims that a single "Defendant" (1) "represented it would" operate "a genuine lottery," Compl ¶ 75; (2) "engaged in an unconscionable course of conduct," *id.*; (3) "breached the contract," *id.* ¶ 67; and (4) "agreed" to select

$1 million recipients by "drawing randomly," *id.* She does not, however, specify which defendant is charged with these alleged misdeeds. She also cites numerous news articles, *id.* ¶¶ 11, 20, which begs the question: did Plaintiff rely on a statement by a Defendant, or did she instead rely on a reporter's characterization in perceiving a "lottery"? Similarly, though Musk founded America PAC and is free to discuss its activities, his statements are not the official terms of the petition program. Yet, Plaintiff purports to rely on them as such.

As Rule 9(b) implicitly recognizes, a defendant cannot fairly respond to allegations of fraud when the complaint does not even specify who is charged with what purportedly fraudulent conduct. Accordingly, this case should be dismissed for failure to plead fraud with particularity as Rule 9(b) requires. But even if Rule 9(b) did not apply (or if the Complaint satisfied it), this case should still be dismissed because Plaintiff has not stated a plausible claim for relief.

### c. Plaintiff has not pled a plausible legal claim.

#### i. Plaintiff's fraud claim fails because she alleges no false representation.

To prevail on a fraud claim under Texas law, a plaintiff must show, *inter alia*, that "the defendant made a material representation that was false" and "the plaintiff actually and justifiably relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018) (citations omitted). Plaintiff's fraud claim fails because the pleadings negate the existence of two essential elements.

<u>No false representation.</u> As best as one can tell from the Complaint, Plaintiff's case hinges on Musk's use of the word "randomly" to describe the spokesperson selection process, and her theory that this was a "false representation" because spokespersons "were pre-determined" and "selected based on subjective criteria." Compl. ¶ 55. Merriam-Webster defines "randomly" as "lacking a definite

plan, purpose, or pattern."[14] Synonyms include "scattered," "erratic," accidental," and "arbitrary."[15] That the PAC "pre-determined" spokespersons before announcing them is wholly consistent with the notion that spokespersons were chosen without "a definite plan, purpose, or pattern," and therefore does not allege any "false" representation by Defendants.

Nor does the word "randomly" falsely represent "that by signing the petition, Plaintiff [was] eligible to win $1,000,000 through random selection *in a daily lottery*." Compl. ¶ 54 (emphasis added). A lottery requires chance, prize, and consideration. Tex. Penal Code § 47.01(7). Plaintiff concedes that—from the first announcement of the $1 million opportunities on October 19—the requirement to serve as a spokesperson *in exchange for* the $1 million was disclosed. Compl. ¶ 15. Indeed, in the same video where Musk loosely used the word "randomly" to describe the selection process, he also announced that any $1 million payment was conditioned on the recipient's "agree[ment] to be a spokesperson for America PAC." Compl. ¶ 15. Plaintiff also notes that spokespersons were *present at the town halls* where they were announced. *Id.* ¶¶ 14, 18. She even quotes the PAC's post—made "[s]hortly after Musk's live announcement of Mr. Dreher"—specifying that $1 million recipients were "**selected to earn** $1 MILLION." *Id.* ¶ 16 (citation omitted) (emphasis added). This defeats any notion that the $1 million was a "prize" and any finding that Defendants represented the existence of a lottery. Plaintiff has not pled any false representation.

No damages. For the same reasons Plaintiff fails to allege injury for standing purposes, she also fails to allege damages. She therefore fails to state this essential element of her fraud claim. Accordingly, that claim should be dismissed on the pleadings.

### ii.    Plaintiff's breach of contract claim fails for want of a valid contract.

A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3)

---

[14] https://www.merriam-webster.com/dictionary/randomly.
[15] https://www.merriam-webster.com/thesaurus/random.

the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach.

*USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502, n.21 (Tex. 2018) (citation omitted). At the 12(b)(6) stage, a complaint "must assert enough facts that make it plausible" that each element of a breach of contract claim is met. *Provision Grp., Inc. v. Crown Toxicology, Ltd.*, No. 5:16-CV-1291-DAE, 2017 WL 11221433, at *3 (W.D. Tex. Oct. 19, 2017). Plaintiff's breach-of-contract claim fails because she has not plausibly pled facts giving rise to a valid contract or damages.

<u>No contract</u>. The pleadings cannot support the existence of a valid, enforceable contract. Plaintiff admits that the petition program "was '*exclusively open to registered voters* in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina.'" Compl. ¶ 10 (emphasis added). Plaintiff does not allege that she is a registered voter in any of these states, which forecloses a finding that Defendants ever made an "offer" to her. Moreover, a valid contract requires, *inter alia*, a meeting of the minds as to the essential terms. *Menchaca*, 545 S.W.3d at 502, n.21 (citation omitted). But the Complaint avers that "Defendants knew all along the winners were pre-determined, and had no intention of operating a genuine lottery." Compl. ¶ 75. This allegation, if true, forecloses a showing of mutual assent to the terms that Plaintiff claims she and Defendants agreed to (*i.e.*, that "Defendant had agreed to" choose $1 million recipients by "drawing randomly," *id.* ¶ 67).

In addition, the contract that Plaintiff alleges would be void and unenforceable, even if there were mutual assent. "Under Texas law, a contract is illegal, and thus void, if the contract obligates the parties to perform an action that is forbidden by the law of the place where the action is to occur." *In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008) (citation omitted). Texas law prohibits Defendants

from operating a lottery. TEX. CONST. art. III, § 47.[16] Accordingly, any contract that would obligate

them to award $1 million prizes via a lottery would be unenforceable under Texas law for illegality.

No damages. Finally, even if there had been a valid contract between the parties, and even if

Defendants had breached, this claim would still fail because Plaintiff provides no basis to conclude

that her situation is any different as a result. Thus, she has not plausibly pled damages. *See, e.g.*, *Gensetix,*

*Inc. v. Baylor Coll. of Med.*, 616 S.W.3d 630, 645 (Tex. App.—Houston [14th Dist.] 2020) ("The goal in

measuring damages for a breach-of-contract claim is to provide just compensation for any *loss or damage*

*actually sustained as a result of the breach.*") (citations omitted) (emphasis added). Plaintiff's failure to plead

any damages—as discussed in detail above—defeats this claim.

### iii.    Plaintiff's DTPA claim fails because Plaintiff is not a "consumer."

The DTPA exists "to protect consumers against false, misleading, and deceptive business

practices, unconscionable actions, and breaches of warranty and to provide efficient and economical

procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a). Under the

"unconscionability arm" of the DTPA that Plaintiff invokes, "[a] *consumer* may maintain an action

where the following constitute[s] a producing cause of economic damages or damages for mental

anguish: any unconscionable action or course of action by any person." *Id.* § 17.50 (a)(3) (emphasis

added). Plaintiff's DTPA claim fails for at least three reasons.

First, and most obviously, Plaintiff is not a consumer. The DTPA defines a "consumer" as "an

individual…who seeks or acquires by purchase or lease, any goods or services." *Id.* § 17.45(4).

"Goods" are "tangible chattels or real property purchased or leased for use," whereas "'Services'

---

[16] The Texas Constitution generally prohibits "lotteries," and "[t]he Legislature shall pass laws prohibiting lotteries and gift enterprises in this State *other than those authorized by … this section.*" TEX. CONST. art. III, § 47 (emphasis added). The four exceptions are inapplicable to the facts alleged here. *See id.* (exceptions apply to charitable bingo; raffles by religious and similar organizations; raffles by qualified professional sports teams; and the state lottery).

means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." *Id.* § 17.45(2), (1).

Plaintiff's theory of DTPA liability is that she "purchased the right to be in Defendants' lottery by providing her personal information." Compl. ¶ 11. Plaintiff concedes that spokespersons were not chosen by chance, and therefore concedes as a matter of fact and law that Defendants did not operate a lottery. *See supra*, p.5. But even if Defendants had operated a lottery, "a lottery ticket is a right to participate in the drawing. … As such, it is an intangible, and therefore neither a good nor a service" under the DTPA. *Kinnard v. Circle K Stores Inc.*, 966 S.W.2d 613, 618 (Tex. App.—San Antonio 1998, reh'rg overruled). Therefore, the DTPA does not apply to the allegations in the Complaint.

<u>Second</u>, Plaintiff does not allege "economic damages" or "mental anguish," as required for the DTPA to apply. Tex. Bus. & Com. Code § 17.50(a)(3). Under the DTPA, "[e]conomic damages" means compensatory damages for pecuniary loss, including costs of repair and replacement. The term does not include exemplary damages." *Id.* § 17.45(11). The Complaint's threadbare allegation that she "suffered damages by giving [her] personal information to Defendants without receiving…a legitimate and random chance to win [a] prize equivalent to all other [petition signers]," Compl. ¶ 77, does not allege any "economic damages" as defined by the DTPA or mental anguish.

<u>Third,</u> the DTPA does not apply where "every operative fact occurred outside of the state of Texas," because "[t]he DTPA requires that the 'trade or commerce' in question 'directly or indirectly affect[ ] the people of this state.'" *Cogan v. Triad Am. Energy*, 944 F. Supp. 1325, 1336 (S.D. Tex. 1996) (quoting Tex. Bus. & Comm. Code § 17.45(6)). Plaintiff is an Arizonan, and the petition program was not open to Texas voters. Compl. ¶ 10. Moreover, Complaint does not claim that any alleged "misrepresentation" occurred in Texas. Accordingly, the facts alleged do not give rise to a Texas DTPA claim. *Cogan*, 944 F. Supp. at 1336; *see also Bass v. Hendrix*, 931 F. Supp. 523, 536 (S.D. Tex. 1996) ("any alleged misrepresentations…occurred outside of Texas and it could not have been

anticipated that they would have an effect on a Texas resident. Under these circumstances, the applicability of the DTPA is doubtful.").

### iv.    Plaintiff has not pled a plausible unjust enrichment claim.

In Texas, "[u]njust enrichment is an equitable theory of recovery that is based on an implied agreement to pay for benefits received," and is cognizable only in the absence of a contract between the parties. *Jupiter Enters. v. Harrison*, No. 05-00-01914-CV, 2002 WL 318305, at *3 (Tex. App.—Dallas Mar. 1, 2002, no pet.) (citing *Vortt Exploration Co. v. Chevron USA.*, 787 S.W.2d 942, 944 (Tex. 1990)). To plead a claim for unjust enrichment, the plaintiff must allege

> (1) that valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by that person; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*Id.* (citing *Vortt*, 787 S.W.2d at 944). The Complaint fails to allege, at a minimum, elements 1 and 3.

Plaintiff fails to allege element 1 because she does not allege providing valuable services or materials to Defendants. That is because—for purposes of an unjust enrichment claim—"personal information 'does not have an inherent monetary value,' and 'collection of personal information does not create an economic loss.'" *Logan v. Marker Grp., Inc.*, No. 4:22-CV-00174, 2024 WL 3489208, at *11 (S.D. Tex. July 18, 2024) (dismissing unjust enrichment claim based on alleged unauthorized access to personal data) (citations omitted).

Plaintiff also fails to allege element 3 because she does not claim that her information was actually "used and enjoyed" by Defendants. *Jupiter Enters.*, 2002 WL 318305, at *3. Instead, she simply makes a vague and speculative assertion that Defendants "can profit or benefit from the use/sale of" her information for unspecified "political or commercial use." Compl. ¶¶ 35, 81. This is insufficient to sustain an unjust enrichment claim.

**d.    Plaintiff's claim for injunctive relief fails with her substantive claims.**

Because Plaintiff's substantive claims fail, so too does her claim for injunctive relief. *E.g.*, *Flowers v. Deutsche Bank Nat. Tr. Co.*, 614 F. App'x 214, 216 (5th Cir. 2015) ("[Plaintiff's] claims for a declaratory judgment and injunctive relief fail because none of [Plaintiff's] substantive claims remain.").

CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety.

Respectfully submitted,

*/s/ Anne Maire Mackin*

Chris K. Gober
Texas State Bar No. 24048499
Anne Maire Mackin
Texas State Bar No. 24078898
Lex Politica PLLC
P.O. Box 341016
Austin, TX 78734
Telephone: 512-354-1785
cgober@lexpolitica.com
amackin@lexpolitica.com

*/s/ Andy Taylor*
Andy Taylor
Texas State Bar No. 19727600
Andy Taylor & Associates, P.C.
2628 Highway 36S, #288
Brenham, Texas 77833
713-412-4025 (mobile)
ataylor@andytaylorlaw.com

**ATTORNEYS FOR DEFENDANTS
ELON MUSK & AMERICA PAC**