**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| JOY HARVICK, individually and on behalf of all others similarly situated, *Plaintiff,* | § § § § | |
| v. | § § | Case No. 1:24-cv-1373-RP |
| ELON MUSK & AMERICA PAC, *Defendants.* | § § § § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and the Scheduling Order in this Case (Dkt. 33, ¶ 6), Defendants Elon Musk and America PAC respectfully move for summary judgment on Plaintiff Joy Harvick's claims for fraud, breach of contract, and unjust enrichment.

**INTRODUCTION**

This case fails because the undisputed record defeats each live claim as a matter of law. In October 2024, America PAC launched a citizen petition supporting the Constitution's First and Second Amendments, together with a referral program under which eligible voters could earn payments for successful referrals and be considered for the opportunity to earn $1 million for serving as a paid spokesperson for the PAC. After she was not selected as a spokesperson, Plaintiff filed this suit alleging fraud, breach of contract, and unjust enrichment based on her contention that the spokesperson selection process operated in a manner different from what she claims she understood.[1]

The developed record defeats Plaintiff's case. As an initial matter, discovery has confirmed that Plaintiff lacks standing as she cannot establish a cognizable injury, causation, or redressability. Plaintiff's claims also fail on the merits. Her fraud claim fails because the record shows no false statement of material fact and no justifiable reliance by Plaintiff on any statement by Defendants. Her

---

[1] Plaintiff also initially brought a claim under the Texas Deceptive Trade Practices Act but abandoned it. *See* Dkt. 7 at 14.

1

breach of contract claim fails because there was no valid or enforceable contract and no definite contractual term breached. Her unjust enrichment claim fails because the basic contact information Plaintiff provided on the Petition was not a "benefit" conferred upon Defendants. Finally, this case against Mr. Musk independently fails because his involvement was as an America PAC donor and advocate, not as someone with authority or decision-making responsibility for America PAC.

Rule 56 requires summary judgment where the nonmovant lacks evidence sufficient to support essential elements of her claims. That is precisely the circumstance here. The developed record confirms that Plaintiff cannot establish standing and cannot prove the essential elements of any of her causes of action. Defendants are therefore entitled to judgment as a matter of law.

## UNDISPUTED FACTS

### I.    The Petition

In October 2024, America PAC, an independent expenditure only political committee, created a Petition in Favor of Free Speech and the Right to Bear Arms ("Petition").[2] Verified registered voters in seven states—Arizona, Georgia, Michigan, North Carolina, Nevada, Pennsylvania, and Wisconsin—("Eligible Voters") who signed the Petition and referred ("Referrers") other Eligible Voters ("Referees") to sign could earn compensation for each eligible referral.[3] For each verified signer who listed them, a Referrer could earn $47 (or, at certain times in Pennsylvania, $100).[4] Verified eligible signers in Pennsylvania could also receive $47 or $100 (depending on timing) for their own signature, a benefit not offered in other states.[5]

To sign the Petition, individuals entered their name, phone number, email, and mailing address on the Petition website.[6] The Petition asked signers if someone referred them and provided a field for

---

[2] Harvick Dep. Ex. 2 at 1 (Appx.37); Young Dep. Ex. 9 (Appx.137), 108:1, 108:23–109:2 (Appx.78–79).
[3] Young Dep. 158:12–159:10 (Appx.81–82).
[4] Young Dep. 157:3–159:10 (Appx.80–82); Harvick Dep. Ex. 2 (Appx.37–39); Young Dep. Ex. 9 (Appx.137).
[5] Young Dep. 157:3–159:10 (Appx.80–82).
[6] Harvick Dep. Ex. 2 (Appx.37–39); Young Dep. Ex. 9 (Appx.137); Young Dep. 157:3–159:10 (Appx.80–82).

a Referrer's information.[7] The Petition clearly set out the terms: each person could sign for payment only once, could list only one eligible referrer, and Referrers and signers had to be registered voters in the seven eligible states.[8] The Petition stated that the signer's cell phone number "Will only be used to confirm you are the legitimate petition signer. No other purpose."[9] America PAC's vendors compared petition submissions to state voter files to verify eligibility and issue referral payments.[10]

## II.    The $1 Million America PAC Spokesperson Opportunities

America PAC also offered selected petition signers the opportunity to earn $1 million as PAC spokespersons. At an America PAC town hall on October 19, 2024, Mr. Musk announced the spokesperson opportunity, stating, "So I have a surprise for you, which is that we're going to be awarding $1 million dollars to—randomly to people who have signed the—signed the petition every day from now until the election."[11] Mr. Musk then stated that John Dreher, who was present at the town hall, was the first person selected for the opportunity, and told him, "**The only thing we ask for the million dollars is that you be a spokesperson for the petition**."[12] Thus, any $1 million payment was expressly conditioned on service as a spokesperson.

America PAC posted a video of the announcement on X that said, "Every day from now until Election Day, one registered swing state voter who signs the petition will be **selected to earn** $1 MILLION," with a link to the petition and a promotional video.[13] In one segment of that promotional video, it says "John just won $1 million for signing this petition: Petition.TheAmericaPAC.org," below text stating that the spokesperson program is an opportunity to "earn."[14]

---

[7] Harvick Dep. Ex. 2 (Appx.37–39); Young Dep. Ex. 9 (Appx.137).
[8] Harvick Dep. Ex. 2 at 2–3 (Appx.38–39); Young Dep. Ex. 9 (Appx.137); Sceusa Dec. ¶ 9 (Appx.140).
[9] Harvick Dep. Ex. 2 at 2 (Appx.38); Young Dep. Ex. 9 (Appx.137); Sceusa Dec. ¶ 9 (Appx.140).
[10] Young Dep. 162:8–17 (Appx.83) & Ex. 9 (Appx.137); Sceusa Dec. ¶ 9 (Appx.140); Young Dep. Ex. 1 (America PAC's Responses to P's Interrogatory Requests ("AMPAC Resp. Rog.")) 7, p. 16–17 (Appx.109–110).
[11] Young Dep. 53:14–18 (Appx.76).
[12] Young Dep. 54:13–16 (Appx.77).
[13] Young Dep. Ex. 4 (Appx.135).
[14] Young Dep. Ex. 4 (Appx.135).

The Petition did not state that all signers would be considered for the spokesperson opportunity, nor did it state how spokespersons would be selected.[15] America PAC's Director and Treasurer, Chris Young, selected each of the 18 individuals offered the opportunity to earn $1 million as a spokesperson and oversaw the program in coordination with America PAC's vendors.[16] Selected spokespersons were registered voters who had already voted in the 2024 general election, signed the Petition, referred multiple other signers, passed a criminal background check, and signed a contract with America PAC.[17] In selecting people for the opportunity to earn $1 million as a spokesperson, Mr. Young also considered social media presence, personal stories, and whether the person would be an effective PAC representative.[18]

### III.  Plaintiff's Participation in the Program

Plaintiff has been a registered voter in Arizona since 2022 and supports the First and Second Amendments.[19] On October 23, 2024, shortly before 4:24 A.M. Mountain Time, Plaintiff signed the Petition with her name, email, mailing address, and phone number; this took "a minute or two."[20] She did not list a referrer.[21] After signing, Plaintiff posted a link to the Petition on three social media accounts and asked people to sign and list her email in the referrer field.[22] Plaintiff did not refer anyone to sign the Petition, received no referral payments, and was not selected as a spokesperson.[23]

Plaintiff admits that the Petition did not say "lottery," "random," "sweepstakes," "win," or "drawing."[24] She also testified that she expected that if America PAC were operating a lottery, there

---

[15] Harvick Dep. Ex. 2 (Appx.37–39); Young Dep. Ex. 9 (Appx.137); Sceusa Dec. ¶ 9 (Appx.140).

[16] Young Dep. 13:8–15:1 (Appx.60–62); 37:13 (Appx.71); 37:24–38:1 (Appx.71–72); AMPAC Resp. Rog. 10, p. 18–19 (Appx.111–112).

[17] AMPAC Resp. Rog. 10, p. 18–19 (Appx.111–112); Young Dep. 32:21–38:8 (Appx.68–72).

[18] AMPAC Resp. Rog. 10, p. 18–19 (Appx.111–112); Young Dep. 32:21–38:8 (Appx.68–72).

[19] Harvick Dep. 22:24–23:9 (Appx.4–5); 37:23–25 (Appx.7).

[20] Harvick Dep. 40:15–24 (Appx.9), 137:18–21 (Appx.32); Sceusa Dec. ¶ 9 (Appx.140).

[21] Harvick Dep. 43:18–20 (Appx.10).

[22] Harvick Dep. Ex. 8 at 000004, 000007, 000008 (Appx.50–52); Harvick Dep. 97:17–98:3 (Appx.28), 114:16–18 (Appx.31).

[23] Sceusa Dec. ¶ 8 (Appx.140).

[24] Harvick Dep. 50:21–51:10 (Appx.11–12).

would be more "fine print" or "disclaimers"[25] on the Petition. Plaintiff hesitated to sign because of her impression—shaped by "hundreds of different things"[26] and "all sorts of sources"[27]—that spokespersons would be selected by lottery. Immediately after signing, she said, "I don't know if the courts will allow it, but I'm going to sign up to win money just in case."[28] She does not recall when she saw each source, and her recollection about which sources influenced her is unclear.[29] But she admits that she heard Mr. Musk tell Mr. Dreher that, in exchange for a $1 million payment, Dreher had to agree to be a spokesperson for America PAC, and does not dispute that the Petition did not purport to be a lottery.[30] [31]

The information input by signers (including Plaintiff) was used only to administer the petition program (by verifying signers, issuing referral payments, and evaluating whether the program impacted voter participation).[32] Plaintiff has never requested that America PAC delete the data that she input on the Petition.[33] Plaintiff uses many emails and phone numbers; signing and posting about the Petition are among a handful of times that she shared her "real information" with others.[34]

## IV. Mr. Musk and America PAC

Mr. Musk was a prominent America PAC donor and spoke publicly to promote the PAC's activities, but "does not have an official role or capacity" with the PAC and was not involved in the

---

[25] Harvick Dep. 90:15–91:1 (Appx.26–27).

[26] Harvick Dep. 82:22–25 (Appx.24).

[27] Harvick Dep. 39:5–40:14 (Appx.8–9); 80:1–8 (Appx.22).

[28] Harvick Dep. 138:22–139:1 (Appx.33–34) & Harvick Dep. Ex. 8 at 000029 (Appx.56).

[29] Harvick Dep. 79:21–80:8 (Appx.21–22) & Ex. 3 at Rog. 1 (Appx.42).

[30] Harvick Dep. 82:1–11 (Appx.24); Harvick Dep. 50:21–51:10 (Appx.11–12).

[31] Plaintiff also believed she would receive $47 for her signature on the Petition, even though only Pennsylvania signers were eligible for signature payments. Harvick Dep. 63:21–64:14 (Appx.19–20). Plaintiff didn't plead that she is owed payment for her signature, and there is no support in the record for the belief that she would receive $47 for that signature.

[32] Young Dep. 21:22–22:3; 31:10–16; 46:23–48:24 (Appx.63–65,73–75); AMPAC Resp. Rog. 13–14, p. 20–21 (Appx.106–107,113–114); Harvick Dep. 56:18–57:6 (Appx.15–16); Sceusa Dec. ¶ 6 (Appx.139).

[33] Harvick Dep. 55:7–10 (Appx.14).

[34] Harvick Dep. 57:7–23; 58:5–59:23 (Appx.16–18). Plaintiff does, however, suspect that her personal information is for sale because she has been notified of data breaches. Harvick Dep. 54:12–24 (Appx.13).

PAC's day-to-day operations.[35] Rather, Mr. Young was and remains the PAC's exclusive decisionmaker.[36] The spokesperson program was "structured and implemented" by America PAC's vendors under Mr. Young's direction.[37] Mr. Musk "discussed the concept for the Spokesperson Opportunity Program at a high level," but the operational details were handled entirely by others.[38]

## LEGAL STANDARD

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). A defendant who would not bear the burden of proof at trial need only "point[ ] out…that there is an absence of evidence to support the nonmoving party's case," then the burden shifts to the nonmovant to produce competent evidence showing a genuine issue for trial. *See, e.g.*, Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 322–25; *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527 (5th Cir. 2015). Conclusory assertions, speculation, or a "mere scintilla of evidence" will not suffice for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999); *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). Thus, even if a plaintiff produces some evidence, summary judgment is proper where that evidence is "merely colorable" or is not "significantly probative." *Anderson*, 477 U.S. at 249-50.

---

[35] Young Dep. 13:8–10 (Appx.60); 37:11–13 (Appx.71); 162:19–163:8 (Appx.83–84); 163:25–165:5 (Appx.84–86); 166:5–18 (Appx.87); 176:11–16 (Appx.90); 177:9–21 (Appx.91).
[36] Young Dep. 13:8–15:1 (Appx.60–62); 37:13 (Appx.71).
[37] AMPAC Resp. Rog. 8, p. 17 (Appx.110).
[38] AMPAC Resp. Rog. 8, p. 17 (Appx.110).

**ARGUMENT AND AUTHORITY**

**I.    Plaintiff lacks standing because she cannot show injury, causation, or redressability.**

"Federal courts do not possess a roving commission to publicly opine on every legal question," nor do they "exercise general legal oversight…of private entities." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Rather, Article III of the Constitution requires a plaintiff to demonstrate that they have: (1) suffered an injury in fact; (2) that is traceable to the defendant's challenged conduct; and, (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "Each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Inclusive Cmtys. Proj., Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citation omitted). "Thus, at summary judgment, [the plaintiff] can't rely on mere allegations; [she] must set forth by affidavit or other evidence specific facts supporting standing." *Id.* (cleaned up).[39]

**Injury in fact.** To establish Article III injury, a plaintiff must show a concrete and particularized injury that is actual or imminent. *Spokeo*, 578 U.S. at 339. "[C]ertain harms readily qualify as concrete injuries under Article III." *TransUnion*, 594 U.S. at 425. "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* Intangible harms can also satisfy Article III, but only if they have a "'close relationship' to harms 'traditionally' recognized as providing a basis for lawsuits in American courts." *Id.* (quoting *Spokeo*, 578 U.S. at 340).[40] The harm must also be particularized, meaning that "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. If a plaintiff has yet to suffer a tangible or intangible harm, they must show

---

[39] Article III's requirements also do not relax in putative class actions: the fact that a suit is a class action "adds nothing to the question of standing," because "even named plaintiffs who represent a class must allege and show that they personally have been injured." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (citation omitted). "[I]n a class action, 'federal courts lack jurisdiction if no named plaintiff has standing.'" *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 823 (5th Cir. 2022) (quoting *Frank v. Gaos*, 586 U.S. 485, 492 (2019) (per curiam)).

[40] This requires a "close historical or common-law analogue for [the] asserted injury." *TransUnion*, 594 U.S. at 414.

that such harm is "certainly impending, or there is a substantial risk that the harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 415 (2013).

Plaintiff cannot show concrete injury from the collection of her information. She voluntarily provided her information on a political petition.[41] She holds the views espoused in the Petition, and she has no evidence that the information she submitted has been used for any purpose other than administering the petition program.[42] The mere provision of name and contact information, without misuse or consequence, is not concrete harm. *See, e.g.*, *Spokeo*, 578 U.S. at 342 ("It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm").

For example, *TransUnion* held that inaccurate information in consumer credit files causes no concrete harm unless disclosed to third parties, because only upon dissemination of such information would plaintiffs suffer "a harm with a 'close relationship' to the harm associated with the tort of defamation," which is "a concrete harm that qualifies as an injury in fact." 594 U.S. at 442. The collection, provision, or existence of the incorrect information alone does not establish standing. *Id.* Likewise, *Hancock v. Urban Outfitters* held that requesting and recording zip codes for credit card transactions without any resulting harm is not a concrete injury. 830 F.3d 511, 514 (D.C. Cir. 2016). Courts routinely reject standing where a plaintiff's information has merely been collected or retained without misuse or material risk of misuse. *E.g., Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016); *Logan v. Marker Grp., Inc.*, 2024 WL 3489208, at *5 (S.D. Tex. July 18, 2024).

Plaintiff also has not established confusion-based or bargain-based injury. Her understanding that spokespersons would be selected by "random drawing" in a "lottery"[43] does not change this result, because "the state of confusion, absent more, is not a concrete injury under Article III." *Perez,*

---

[41] Harvick Dep. 106:17–22 (Appx.30); 37:23–25 (Appx.7).
[42] Young Dep. 21:22–22:3; 31:10–16; 46:23–48:24 (Appx.63–65,73–75); AMPAC Resp. Rog. 13–14, p. 20–21 (Appx.106–107,113–114); Harvick Dep. 56:18–57:6 (Appx.15–16); Sceusa Dec. ¶ 6 (Appx.139).
[43] Harvick Dep. 89:4–25 (Appx.25).

45 F.4th at 825 & n.5 (collecting cases). Rather, for confusion to rise to the level of Article III harm, it must be accompanied by "pecuniary loss." *Id.* Providing basic contact information is not pecuniary loss. "Such basic information is available through ordinary inquiry and observation" and "[i]t is not the kind of information that, in the wrong hands, poses a serious risk of identity theft." *Alvarez v. Musk*, No. 1:24-cv-01174-RJJ-MV, Dkt. 24 at *9 (W.D. Mich.—Southern Div., Jun. 2, 2025). Moreover, to the extent Plaintiff frames her theory as one based on the loss of an expected benefit from the spokesperson selection process, the record still shows no concrete economic injury, no denied payment to which she was entitled, and no other tangible consequence sufficient to establish Article III standing. "[N]o tort makes a person liable for wasting another's time." *Sweeney v. Holt & Young, P.C.*, No. H-22-1230, 2023 WL 4977803, at *2 (S.D. Tex. July 24, 2023), *report and recommendation adopted*, No. CV H-22-1230, 2023 WL 4976193 (S.D. Tex. Aug. 3, 2023) (citing *Perez*, 45 F.4th at 825). [44]

Furthermore, there is no diminution-of-value injury. The Fifth Circuit has not recognized such injuries as sufficient for Article III standing, but even if they had, there is no evidence that (1) she "attempted to or would have ever sold" her information; (2) if she "now attempted to sell" this information, she "would be forced to accept a diminished price for it;" or, (3) the information "is (or was) being actively distributed on the dark web or any other marketplace for private information." *In re ESO Sols., Inc. Breach Litig.*, No. 1:23-CV-1557-RP, 2024 WL 4456703, at *7 (W.D. Tex. July 30, 2024). Absent evidence of "the actual distribution of their information, [a plaintiff] cannot viably claim that their PII has diminished in value." *Id.* [45]

---

[44] *See generally Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 937 (5th Cir. 2022) (plaintiffs who asserted right under NVRA to obtain voter information but "offered no meaningful evidence regarding any downstream consequences from…not obtaining the requested personal voter information [] assert[ed] no cognizable injury in fact").

[45] *See also, e.g.*, *Logan v. Marker Grp., Inc.*, No. 4:22-CV-00174, 2024 WL 3489208, at *7 (S.D. Tex. July 18, 2024); *Williams v. Bienville Orthopaedic Specialists, LLC*, 737 F. Supp. 3d 411, 422 (S.D. Miss. 2024) (holding that "claims of injury-in-fact based on lack of benefit-of-the-bargain and diminished value of private information are not well-taken" where "[t]here is no allegation that any of the plaintiffs paid a certain amount of money to [defendant] in exchange for protection of their private information or that they intend to sell their private information.") (citations omitted).

Plaintiff likewise cannot establish standing based on any purported "future" injury, because there is no evidence that Defendants might use the 2024 name, email, mailing address, and phone number that she put on the Petition for anything in the future. Accordingly, she cannot show that any cognizable injury is "certainly impending, or there is a substantial risk that the harm will occur," as she must to establish standing based on future injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. at 414 n.5.

**Traceability.** Plaintiff "relied on probably hundreds of things" including news articles, YouTube videos, and legacy media reports to reach her understanding of the spokesperson opportunity program, and she was surprised that the Petition itself did not contain more "fine print" and "disclaimers."[46] Accordingly, Plaintiff cannot show that her incorrect understanding that America PAC was operating a lottery was "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," including third-party sources that crystallized her understanding that she was entering a lottery. *Lujan*, 504 U.S. at 560.

**Redressability.** At summary judgment, redressability (like every other standing element) must be supported with evidence, not just allegations. *Texas State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022); *Inclusive Cmtys. Proj.*, 946 F.3d at 655. The question is whether the record would permit a reasonable factfinder to conclude that the relief Plaintiff seeks—damages or injunctive relief—would likely remedy a concrete injury she actually suffered. It would not.

There is no evidence that the basic contact information Plaintiff submitted—name, phone number, email, and mailing address—had any measurable economic value to her, much less that she suffered a compensable loss that a money judgment could restore. The undisputed record shows that voter-contact information is widely available at minimal or no cost and was already available to America PAC for purposes of administering the petition program.[47] Any claimed economic loss is

---

[46] Harvick Dep. 39:5–40:14 (Appx.8–9), 80:1–8 (Appx.22), 82:22–25 (Appx.24), 90:1–91:1 (Appx.26–27).
[47] Young Dep. 171:1–25 (Appx.89); 31:10–16 (Appx.65).

therefore speculative and insufficient at summary judgment. *See, e.g.*, *Logan v. Marker Grp.*, 2024 WL 3489208, at *7 (S.D. Tex. July 18, 2024) ("Because personal information 'does not have an inherent monetary value[,]'…collection of personal information does not create an economic loss.") (citations omitted); *Green v. eBay Inc.*, No. CIV.A. 14-1688, 2015 WL 2066531, at *5 (E.D. La. May 4, 2015).

Plaintiff's request for injunctive relief also fails. She seeks to bar future use or require destruction of her information, but her theory of harm is backward-looking: that she already provided her information for "nothing." An injunction directed at future conduct does not remedy alleged past injury. *Clapper*, 568 U.S. at 409. Nor is there evidence of any ongoing or imminent misuse that such relief would prevent. The record shows no use beyond administering and assessing the now-concluded petition program.[48] Because materially similar information was and remains independently available, an order requiring deletion would not meaningfully alter Defendants' access to the underlying data.

In short, Plaintiff's redressability theory—like the other elements of her standing—never progresses beyond allegation, and this case should be dismissed for lack of Article III standing.

## II.    Plaintiff's fraud claim fails because she cannot satisfy its essential elements.

> To prevail on a fraud claim, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff *actually and justifiably* relied upon the representation *and suffered injury* as a result.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (cleaned up).[49]

---

[48] Young Dep. 21:22–22:3; 31:10–16; 46:23–48:24 (Appx.63–65,73–75); AMPAC Resp. Rog. 13–14, p. 20–21 (Appx.106–107,113–114); Harvick Dep. 56:18–57:6 (Appx.15–16); Sceusa Dec. ¶ 6 (Appx.139).

[49] Even if Arizona law applied to Plaintiff's fraud claim, that claim would still fail, because a fraud claim under Arizona law requires a plaintiff to show these same elements. *See, e.g.*, *Dawson v. Withycombe*, 163 P.3d 1034, 1046 (Ariz. Ct. App. 2007) ("A civil claim for fraud is established by showing that the tortfeasor made a false and material representation, WITH KNOWLEDGE of its falsity or ignorance of its truth, with intent that the hearer would act upon the representation in a reasonably contemplated manner, and that the hearer, ignorant of the falsity of the representation, rightfully relied upon the representation and was thereby damaged."); *but see Lessin v. Ford Motor Co.,* 756 F. Supp. 3d 885, 947 (S.D. Cal. 2024), *amended on reconsideration in part,* No. 19-CV-01082-AJB-AHG, 2025 WL 97598 (S.D. Cal. Jan. 14, 2025), *aff'd in part, rev'd in part and remanded,* No. 25-2211, 2026 WL 382608 (9th Cir. Feb. 11, 2026) (discussing whether fraud claims under Texas and Arizona law are susceptible to class-wide proof).

Fraud is evaluated at the time of the alleged inducement. *See Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228–29 (Tex. 2019). Accordingly, this claim turns on what existed when Plaintiff signed the Petition. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Plaintiff cannot establish these essential elements.

**No false statement of fact.** Fraud requires a demonstrably false representation of existing fact that is specific, definite, and objectively verifiable. *Italian Cowboy P's, Ltd. v. Prudential Ins. Co.*, 341 S.W.3d 323, 337 (Tex. 2011); *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). Statements of opinion, puffery, or generalized promotional language are not actionable because they lack the precision and concreteness required to show truth or falsity. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995); *see also Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986); *Transport Ins. Co.*, 898 S.W.2d at 276 ("Whether a statement is an actionable statement of "fact"…often depends on the circumstances in which a statement is made.").

In evaluating speech in a First Amendment context, courts ask whether it can reasonably be understood as asserting verifiable fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

Plaintiff cannot identify any false representation of fact. The Petition made no promise regarding how spokespersons would be selected. It set forth referral-payment criteria and identified individuals who had earned $1 million, but did not describe any selection methodology or limit America PAC's discretion.[50] Plaintiff admits that the Petition—the only representation before her when she signed—did not use the terms "lottery," "random," "sweepstakes," "win," or "drawing."[51] Instead, it mentioned an opportunity to "earn" as a spokesperson. That is fundamentally different from a guaranteed chance to win through a defined process. A fraud claim cannot supply procedural guarantees that were never made. *See, e.g., JPMorgan*, 546 S.W.3d at 657.

---

[50] Harvick Dep. Ex. 2 at 2–3 (Appx.38–39); Young Dep. Ex. 9 (Appx.137); Sceusa Dec. ¶ 9 (Appx.140).
[51] Harvick Dep. 50:21–51:10 (Appx.11–12).

Nothing in the Petition contradicts the undisputed fact that spokesperson selection involved discretionary criteria, including geography, referrals, voting status, background checks, and suitability.[52] Plaintiff identifies no representation limiting that discretion, and none may be inferred.

Nor can Plaintiff recast generalized advocacy language into a specific promise about an undisclosed internal process. Texas law does not permit a fraud claim to proceed on that basis. *See Jefferson Assocs.*, 896 S.W.2d at 163; *Presidio*, 784 F.2d at 679. Her own testimony confirms that her "lottery" belief arose from third-party sources.[53]

Plaintiff's fallback reliance on the word "randomly" also fails. The undisputed evidence shows that selection included an initial component of randomness—pulling from a large pool of eligible signers—followed by discretionary screening and final selection.[54] Even if "randomly" were construed as a representation of methodology rather than a colloquial shorthand, it is not materially false. Courts have recognized that "random selection" does not require "statistical randomness." *United States v. Bearden*, 659 F.2d 590, 602 (5th Cir. 1981) (construing statute providing for jurors to be identified by "random selection."); *Gree, Inc. v. Oy*, No. 2:19-CV-00310-JRG-RSP, 2020 WL 6050574, at *8 (E.D. Tex. Oct. 12, 2020), *report and recommendation adopted sub nom. GREE, Inc. v. Supercell Oy*, No. 2:19-CV-00311-JRG-RSP, 2020 WL 14017530 (E.D. Tex. Dec. 14, 2020) ("The Court is not persuaded that 'selected randomly' requires equal selection probability for every potential item.").

**No knowledge of falsity.** There is no evidence that any statement at issue was false when made or made with reckless disregard for truth. Plaintiff's fraud theory rests entirely on Mr. Musk's isolated use of the word "randomly" when announcing the spokesperson program. At most, it reflects imprecise language. Mr. Musk was not involved in program operations, and Mr. Young testified that he was surprised by the "randomly" description—confirming there was no defined representation to

---

[52] AMPAC Resp. Rog. 10, p. 18–19 (Appx.111–112); Young Dep. 32:21–38:8 (Appx.66–72).
[53] Harvick Dep. 39:5–40:14 (Appx.8–9), 80:1–8 (Appx.22), 89:4–20 (Appx.25), 90:1–91:1 (Appx.26–27).
[54] AMPAC Resp. Rog. 10, p. 18–19 (Appx.111–112); Young Dep. 32:21–38:8 (Appx.66–72).

misstate.[55] Moreover, America PAC consistently described the program as an opportunity to "earn," not a guaranteed prize.[56]

**No justifiable reliance.** Plaintiff cannot show actual and justifiable reliance. She testified that she relied on "hundreds" of sources, including third-party media, to reach her understanding of spokesperson selection. That alone defeats reliance.

In any event, reliance would not have been reasonable. A plaintiff "may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted." *Grant Thornton LLP,* 314 S.W.3d at 923 (citation omitted). Here, multiple "red flags" contradict Plaintiff's asserted belief that she was entering a lottery where all participants had an equal opportunity to be selected: (i) the Petition described an opportunity to "earn," and not a "lottery" or "drawing;"[57] (ii) the October 19 announcement conditioned payment on serving as a spokesperson; [58] (iii) the "fine print" Plaintiff expected based on having played the lottery before was absent;[59] and, (iv) Plaintiff expressed contemporaneous doubt that the "courts will allow" the program if it was, in fact, a "lottery," but signed up to "win money just in case."[60] These facts preclude any objectively reasonable belief that a defined lottery mechanism was promised.

**No causation or injury.** A fraud claim requires proof that reliance caused injury. *JPMorgan*, 546 S.W.3d at 653. For the same reasons Plaintiff cannot show causation or injury for standing purposes, she also fails to do so in the context of her fraud claim.

---

[55] Young Dep. 163:18–24 (Appx.84).
[56] Young Dep. 54:13–16 (Appx.77), Young Dep. Ex. 4 (Appx.135).
[57] Harvick Dep. Ex. 2 (Appx.37–39); Young Dep. Ex. 9 (Appx.137); Harvick Dep. 50:21–51:10 (Appx.11–12).
[58] Young Dep. 54:13–16 (Appx.77).
[59] Harvick Dep. 90:1–91:1 (Appx.26–27); 28:1–17 (Appx.6).
[60] Harvick Dep. 138:22–139:1 (Appx.33–34) & Ex. 8 at 000029 (Appx.56).

### III. Defendants are entitled to summary judgment on the breach-of-contract claim because Plaintiff cannot show its essential elements.

A plaintiff asserting a breach-of-contract claim must prove (1) a valid contract; (2) performance; (3) breach; and, (4) damages. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502, n.21 (Tex. 2018).[61] A valid contract requires a definite offer, acceptance, mutual assent, and consideration. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007). At summary judgment, the absence of evidence on any element is dispositive. *Celotex*, 477 U.S. at 322–23. Plaintiff cannot establish a valid contract, breach, or damages.

**No definite contract or mutual assent.** An enforceable offer must contain sufficiently definite terms to allow a court to ascertain the parties' obligations. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Generalized promotional language is not a binding offer. *See Doe v. Emory Univ.*, No. 1:20-CV-2002-TWT, 2021 WL 358391, at *5 (N.D. Ga. Jan. 22, 2021).

The Petition had no defined spokesperson selection protocol and no restriction on America PAC's discretion in hiring. The word "randomly" in promotional remarks is not sufficiently definite to establish contractual obligations. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846. Plaintiff's subjective belief that each petition signer had "an equal chance, sort of like in a state lottery,"[62] cannot create contract terms that were never expressed. Mutual assent is determined objectively, not by *post hoc* interpretation. *Menchaca*, 545 S.W.3d at 502, n.21. Plaintiff identifies no definite spokesperson selection protocol, mandatory payment trigger, or enforceable commitment at the time she signed. Her later characterization cannot supply those missing terms and create a contract.

**No consideration or bargained-for exchange.** Consideration requires a bargained-for exchange of mutual obligations. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408–09 (Tex. 1997). Plaintiff

---

[61] Regardless of whether Arizona law applies to Plaintiff's breach-of-contract claim, the substantive standard for breach of contract is generally the same in Arizona and Texas. *See, e.g.*, *Thomas v. Montelucia Villas, LLC*, 232 Ariz. 92, 96, 302 P.3d 617, 621 (2013). Accordingly, the applicable state law is immaterial for purposes of this Motion.

[62] Harvick Dep. 89:9–15 (Appx.25).

voluntarily signed a political petition. That act does not constitute commercial consideration supporting a bilateral contract. Plaintiff assumed no enforceable obligation, and Defendants assumed no definite payment obligation (in fact, Defendants did *not* pay Plaintiff or anyone else for Plaintiff's signature on the Petition).[63] Plaintiff received only a contingent opportunity—to refer others (she did not)[64] and potentially be selected for the opportunity to earn $1 million as a spokesperson. A contingent opportunity subject to discretionary selection does not create a binding promise or bargained-for exchange. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846.

Moreover, any alleged promise would be illusory. A promise is unenforceable when performance remains entirely within the promisor's discretion. *See In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676–77 (Tex. 2006). Because America PAC retained complete discretion over how to select spokespersons, no enforceable obligation arose, and no contract was formed as a matter of law.[65]

**No breach.** Plaintiff cannot identify any contractual term that was breached. She earned no referral payments because she did not refer anyone.[66] And Defendants did not agree to select spokespersons through a lottery. Courts do not imply contractual obligations that were never expressed. *See, e.g., Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). Absent a definite promise, there can be no breach. *Id.*

**No damages.** Plaintiff also cannot establish damages. A breach-of-contract claim requires proof of actual loss caused by the breach. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors,*

---

[63] Sceusa Dec. ¶ 8 (Appx.140); Young Dep. 157:3–159:10 (Appx.80–82) (signature payments only available in Pennsylvania).

[64] Sceusa Dec. ¶ 8 (Appx.140).

[65] Plaintiff's understanding of the spokesperson opportunity as a private lottery would independently defeat any contract claim. Were that framing correct (it is not), the alleged agreement would be unenforceable under the lottery and public-policy laws of the relevant states. *See, e.g.,* Ariz. Rev. Stat. § 13-3303; 18 Pa. Cons. Stat. § 5512; Ga. Code Ann. § 16-12-22; Nev. Const. art. IV, § 24; Mich. Comp. Laws § 750.372; Wis. Stat. § 945.02(3); N.C. Gen. Stat. § 14-290; Tex. Const. art. III, § 47. Courts in these jurisdictions consistently hold that agreements contrary to such statutes are void and unenforceable. *See, e.g., Zambrano v. M & RC II LLC*, 517 P.3d 1168, 1174 (Ariz. 2022); *Printfly Corp. v. Nemeroff*, 305 A.3d 1017, at *8 (Pa. Super. Ct. 2023); *In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008).

[66] Sceusa Dec. ¶ 8 (Appx.140).

*Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). Plaintiff paid nothing, was guaranteed nothing, and was not deprived of any contractual entitlement. Her assertion that she provided basic contact information for a "chance" does not establish damages, as she identifies no economic loss tied to any breached term. *See, e.g.*, *Gensetix, Inc. v. Baylor Coll. of Med.*, 616 S.W.3d 630, 645 (Tex. App.—Houston [14th Dist.] 2020) ("The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any *loss or damage actually sustained as a result of the breach.*") (citations omitted) (emphasis added). The record contains no evidence of damages.

## IV.    Plaintiff's unjust enrichment claim fails because she cannot show any implied agreement or unjust benefit.

"Unjust enrichment is an equitable theory of recovery that is based on an implied agreement to pay for benefits received," and is available only when there is no contract between the parties. *Jupiter Enters. v. Harrison*, No. 05-00-01914-CV, 2002 WL 318305, at *3 (Tex. App.—Dallas Mar. 1, 2002, no pet.) (citing *Vortt Exploration Co. v. Chevron USA.*, 787 S.W.2d 942, 944 (Tex. 1990)). A plaintiff must show (1) valuable services were rendered or materials furnished; (2) to the person sought to be charged; (3) which were accepted, used, and enjoyed by that person; and (4) under circumstances reasonably notifying the defendant that the plaintiff expected payment. *Id.* Plaintiff cannot show, at a minimum, elements (1), (3), and (4).[67]

First, Plaintiff did not provide "valuable services or materials" as a matter of law. For purposes of an unjust enrichment claim, "personal information 'does not have an inherent monetary value,' and 'collection of personal information does not create an economic loss.'" *Logan v. Marker Grp.*, 2024 WL 3489208, at *11 (citations omitted). This is especially true here, where (1) Defendants did not pay for

---

[67] There is no evidence that Mr. Musk has access to any information Plaintiff submitted on the petition. Harvick Dep. 56:18–57:6 (Appx.15–16); Sceusa Dec. ¶ 6 (Appx.139). This provides an independent basis to dismiss the unjust enrichment claim as to Mr. Musk for lack of evidence on element 2.

Plaintiff's petition signature;[68] (2) Plaintiff's information was used only for petition program administration;[69] and, (3) materially similar information was already available through voter files.[70]

Second, Defendants did not "use and enjoy" Plaintiff's information in any compensable sense. The record shows it was used to verify her eligibility to refer petition signers—not exploited, sold, or monetized. *See Jupiter Enters.*, 2002 WL 318305, at *3.

Third, nothing in the circumstances would notify Defendants that Plaintiff was "expecting to be paid." *See Vortt*, 787 S.W.2d at 944. Signing a political petition does not imply an expectation of compensation.

More broadly, "a key element of unjust enrichment is that the defendant wrongly secured or passively received a benefit from the plaintiff that would be unconscionable to retain. It is not enough that the person sought to be charged received some incidental benefit." *Mehta v. Ahmed*, No. 01-20-00568-CV, 2022 WL 3720181, at *17 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022) (citations omitted) (cleaned up) (holding evidence that a party provided a proof-of-funds letter that could theoretically benefit another's business transaction legally insufficient to establish unjust enrichment because it was "not evidence of anything more than an incidental benefit"); *see also, e.g.*, *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004) (rejecting unjust enrichment claim even where defendants obtained valuable seismic data without a permit, because Defendants "did not wrongfully secure a benefit nor did they passively receive one which would be unconscionable to retain."). At most, Plaintiff alleges that Defendants received routine contact information used for administrative purposes related to the Petition. That is not an unconscionable or unjust benefit.

---

[68] Sceusa Dec. ¶ 8 (Appx.140).
[69] Young Dep. 21:22–22:3; 31:10–16; 46:23–48:24 (Appx.63–65,73–75); AMPAC Resp. Rog. 13–14, p. 20–21 (Appx.106–107,113–114); Harvick Dep. 56:18–57:6 (Appx.15–16); Sceusa Dec. ¶ 6 (Appx.139).
[70] Young Dep. 31:14–15 (Appx.65).

Even if Arizona law applied, the result would be the same. Arizona requires proof of (1) enrichment, (2) impoverishment, (3) a connection between the two, (4) absence of justification, and (5) no adequate legal remedy. *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). "[T]he mere receipt of a benefit is insufficient"; the plaintiff must show that a defendant's retention of a benefit is unjust. *Id.* Plaintiff cannot satisfy these elements. She suffered no cognizable impoverishment, Defendants received no unjust benefit, and any alleged benefit—the use of basic contact information to administer the Petition—is fully justified. As under Texas law, the record is insufficient to support an unjust enrichment claim.

## V.    Mr. Musk's status as a donor independently bars liability.

Plaintiff's claims against Mr. Musk independently fail because the record establishes that he acted as a donor and advocate, and not as an officer, director or authorized decisionmaker.[71] Authority over program administration, financial disbursements, and spokesperson selection rested solely with Mr. Young.[72] Public advocacy by a donor, including appearing at events and promoting initiatives, is ordinary First Amendment activity and does not establish agency or operational control.[73]

Under Texas law, the "right of control" is the defining characteristic of an agency relationship. *See Schrum v. Land*, 12 F. Supp. 2d 576, 582 (S.D. Tex. 1997). "[E]ven if a person acts for or accommodates another, if the accommodating person is not under the other person's control, an agency relationship does not exist." *Walker v. Fed. Kemper Life Assurance Co.*, 828 S.W.2d 442, 452 (Tex. App.—San Antonio 1992, writ denied). Agency is not established solely by an alleged agent's statements but must be established through conduct. *Gaines v. Kelly*, 235 S.W.3d 179, 183 (Tex. 2007).

---

[71] Young Dep. 13:8–15:1 (Appx.60–62), 162:19–163:8 (Appx.83–84), 163:25–165:5 (Appx.84–86), 166:5–18 (Appx.87); AMPAC Resp. Rog. 5 at 15 (Appx.108).

[72] *See id.*; AMPAC Resp. Rog. 8, p. 17 (Appx.110).

[73] *See, e.g.,* Young Dep. 166:5–18 (Appx.87).

Plaintiff has no evidence that America PAC authorized Mr. Musk to define binding program terms, alter eligibility criteria, or bind the PAC contractually. Nor is there evidence that Mr. Musk exercised decision-making authority over the internal mechanics of the spokesperson program. Absent proof of actual authority, apparent authority, or operational control, statements made by a donor in the course of core First Amendment activity cannot bind the PAC as a matter of law. *See Schrum,* 12 F. Supp. 2d at 582. Therefore, the Court should enter summary judgment dismissing Mr. Musk.

## CONCLUSION

Discovery is complete and has established that no genuine dispute of material fact exists. Therefore, Defendants are entitled to judgment as a matter of law in their favor before this case advances to the class certification stage.

Respectfully submitted,

*/s/ Anne Marie Mackin*
Anne Marie Mackin
Texas State Bar No. 24078898
Andy Taylor
Texas State Bar No. 19727600
Nadin Rabelo Linthorst*
New York State Bar No. 5559042
Jesse Vazquez*
Florida State Bar No.1013573
Lex Politica PLLC
P.O. Box 341015
Austin, TX 78734
Telephone: (512) 354-1785
nlinthorst@lexpolitica.com
amackin@lexpolitica.com
jvazquez@lexpolitica.com
ataylor@vantage.network

**ATTORNEYS FOR DEFENDANTS**

*Admitted *pro hac vice*